# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **WINDIE L. PERRY, #500869,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:22-cv-00634** |
| | ) | |
| **GLORIA FISHER,** | ) | **Judge Trauger** |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Windie L. Perry, who is currently in the custody of the Debra K. Johnson Rehabilitation Center in Nashville, Tennessee, filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1). For the reasons below, the Petition will be denied, and this court will not issue a certificate of appealability.

### I. Procedural History

#### A. Trial and Direct Appeal

Petitioner was convicted in 2012 of one count of facilitation of rape of a child, two counts of false imprisonment, two counts of especially aggravated kidnapping, six counts of reckless endangerment, two counts of aggravated child abuse, and one count of aggravated assault. (Doc. No. 13-5 at 43−56). Two of Petitioner's adopted daughters, G.P. and V.P., were the victims of the offenses. The Tennessee Court of Criminal Appeals organized Petitioner's convictions in a table similar to the following:

| Count | Offense | Victim | Classification |
|---|---|---|---|
| 1 | Facilitation of Rape of a Child | G.P. | Class B felony |
| 9 | False Imprisonment | G.P. | Class B misdemeanor |
| 13 | Especially Aggravated Kidnapping | G.P. | Class A felony |

1

| 15 | Especially Aggravated Kidnapping | V.P. | Class A felony |
|----|----------------------------------|------|----------------|
| 17 | False Imprisonment | G.P. | Class B misdemeanor |
| 21 | Reckless Endangerment | G.P. | Class A misdemeanor |
| 22 | Aggravated Child Abuse | V.P. | Class B felony |
| 23 | Aggravated Child Abuse | G.P. | Class B felony |
| 27 | Reckless Endangerment | G.P. | Class A misdemeanor |
| 31 | Reckless Endangerment | V.P. | Class A misdemeanor |
| 36 | Aggravated Assault | G.P. | Class C felony |
| 37 | Reckless Endangerment | V.P. | Class A misdemeanor |
| 46 | Reckless Endangerment | V.P. | Class A misdemeanor |
| 47 | Reckless Endangerment | G.P. | Class A misdemeanor |

(Doc. No. 14-15 at 2); *State v. Perry*, No. M2014-00029-CCA-R3-CD, 2015 WL 3540554, at *1 (Tenn. Crim. App. June 5, 2015). The trial court sentenced Petitioner to concurrent 20-year prison terms for each count of especially aggravated kidnapping, plus shorter concurrent sentences for the remaining offenses. (*Id.*)

On direct appeal, Petitioner argued that she was convicted despite insufficient evidence of the offenses of especially aggravated kidnapping, aggravated child abuse, aggravated assault, and facilitation of rape of a child. (Doc. No. 14-4 at 7−16). The Tennessee Court of Criminal Appeals reversed Petitioner's conviction for aggravated assault and otherwise affirmed the judgments of the trial court. (Doc. No. 14-15 at 35). The Tennessee Supreme Court denied Petitioner's application for leave to appeal. (Doc. No. 14-24).

**B. State Post-Conviction Proceedings**

In March 2016, Petitioner filed a pro se petition for state post-conviction relief. (Doc. No. 15-1 at 4−14). She later filed an amended petition with the assistance of counsel. (Doc. No. 15-2 at 44−59). After a hearing, the trial court denied relief. (Doc. No. 15-3 at 51−75).

On post-conviction appeal, Petitioner argued that trial counsel was ineffective for

- not objecting when the trial court provided the jury with a written guide to the counts in the indictment; and

- not objecting when the State requested to treat V.P. and G.P. as hostile witnesses.

(Doc. No. 16-9 at 12−18). Petitioner also argued ineffective assistance of post-conviction counsel. (*Id.* at 18−20). The Tennessee Court of Criminal Appeals affirmed, (Doc. No. 16-7); *Perry v. State*, No. M2019-2074-CCA-R3-PC, 2021 WL 4075113 (Tenn. Crim. App. Sept. 8, 2021), and the Tennessee Supreme Court denied permission to appeal, (Doc. No. 16-20).

### C. 28 U.S.C. § 2254 Proceedings

Petitioner next filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1). In the Petition, she raises the following grounds:

1. trial counsel was ineffective for failing to object when the trial court provided the jury with a written guide to the counts in the indictment;

2. trial counsel was ineffective for failing to object when the State requested to treat V.P. and G.P. as hostile witnesses;

3. post-conviction counsel was ineffective; and

4. she was denied due process because the jury was not sequestered.

(Doc. No. 1 at 5−12).

Respondent filed an Answer. (Doc. No. 17). Petitioner did not reply, and the deadline to do so has passed. (*See* Doc. No. 8). The Petition is thus fully briefed.

## II. Summary of Evidence

### A. Trial Evidence

The Tennessee Court of Criminal Appeals on direct review summarized the trial evidence as follows:

3

*State's Case–in–Chief*

At trial, the Defendant's neighbor, Mary Taylor, testified that, in the early evening on March 18, 2008, she heard loud screaming outside her home. When Mrs. Taylor opened her front door, she saw two young girls. The older, taller girl was screaming and crying. She had on a boy's shirt, "some very shabby jeans," and no shoes. The younger girl was trying to drag the older girl away from Mrs. Taylor's house. The older girl appeared terrified and asked Mrs. Taylor to help her. When she got to Mrs. Taylor's front porch, the younger girl ran towards the Defendant's home.

Mrs. Taylor noticed that the older girl, whom Mrs. Taylor later identified as the Defendant's 13-year-old daughter, V.P., had a large knot on her head that was bleeding and a swollen, bloody lip. Mrs. Taylor asked her husband to hand her the phone, and she called 911 while standing outside on the porch with V.P.

Moments later, the Defendant and her husband, Mr. Perry, arrived at Mrs. Taylor's residence. V.P. begged Mrs. Taylor, "Don't make me go back there[.]" Unsure of the situation, Mrs. Taylor placed V.P. behind her back. Mr. Perry told V.P. to come with him, but the girl began whimpering and cowering behind Mrs. Taylor. When V.P. would not leave with him, Mr. Perry accused Mrs. Taylor of kidnapping the child and threatened to have her arrested. The Defendant screamed at Mrs. Taylor that she needed to give back her daughter. Mrs. Taylor, who was still on the phone with the 911 dispatcher, informed the Defendant that she had called the police and that, when officers arrived, they could sort out the situation. When the Defendant began pulling on V.P.'s arm, Mrs. Taylor noticed that V.P.'s hand appeared to be broken and that V.P. was trying to protect her hand. V.P. told Mrs. Taylor that she did not want to go home, so Mrs. Taylor "body blocked" the Defendant and Mr. Perry until police arrived.

Once officers arrived, V.P. went inside Mrs. Taylor's home. Mrs. Taylor recalled that V.P. was happy and relieved to be inside. She appeared to be very hungry and ate two bowls of chicken and dumplings and an entire bag of goldfish crackers. Mrs. Taylor offered V.P. a popsicle, but V.P. was unable to hold it because her hand was so malformed. Mrs. Taylor testified that her thumb "looked totally out of joint," and V.P. was unable to move it.

After eating, V.P. had to use the bathroom, but she could not get her pants off because they were tied with a cord that had been knotted tight. Eventually, an officer had to cut the cord so that V.P. could use the bathroom. Mrs. Taylor testified that V.P. was dirty, her hair was matted and unkempt, and she smelled very badly.

Officer Bruce Pettitt, with the Clarksville Police Department, testified that he responded to a disturbance call at Mrs. Taylor's home on March 18, 2008. When he arrived, Officer Pettitt saw Mrs. Taylor standing on the porch of her house with V.P. behind her. The Defendant was in the yard yelling at Mrs. Taylor and V.P. Mr. Perry and several other children were standing in the yard behind the Defendant. Officer Pettitt separated the parties and took Mrs. Taylor and V.P. into Mrs. Taylor's house.

4

While talking to V.P., Officer Pettitt noticed that she had a small amount of blood on her mouth. She also had a laceration on her head, some puncture wounds on her hands, and "what looked like old wounds on her ankles that were consistent with ... ligature marks." V.P. also appeared small for her age. She looked "disheveled" and smelled badly.

After his initial interview with V.P., Officer Pettitt went outside to speak to the Defendant. When he asked the Defendant how V.P. received her injuries, the Defendant gave multiple stories. Initially, the Defendant said that V.P. got the cut on her head and blood on her mouth when she had fallen down while running away from the house. The Defendant then told Officer Pettitt that V.P. had inflicted the wounds on herself. The last story from the Defendant was that V.P. received the injuries while fighting with her 11–year–old sister.

At one point, Officer Pettitt accompanied the Defendant back to her house to look for some medication. Once inside the Defendant's residence, Officer Pettitt could smell "the very strong odor" of dog excrement and urine and noticed that clothes were piled everywhere. Officer Pettitt testified that the house was in such a state that he found it difficult to believe anyone actually lived there.

Officer Heather Hill of the Clarksville Police Department testified that she responded to Mrs. Taylor's residence to assist Officer Pettitt. Officer Hill sat with V.P. at Mrs. Taylor's kitchen table while V.P. ate goldfish crackers and drank a soft drink. V.P. was very timid and shy and did not want to make eye contact with Officer Hill. V.P. seemed to be very hungry and was focused on eating.

Officer Hill recalled that V.P. had on boy's jeans, which were tied with a string. She also wore a boy's short sleeve button down shirt and a red undershirt but no undergarments. V.P. had a bloody lip and blood on her shirt. Officer Hill noticed that V.P. had an open wound to the top of her head and marks on her arms. Officer Hill photographed scars and marks that she found on V.P.'s wrists, hands, back, legs, feet, and ankles. V.P. told Officer Hill that she had been abused by the Perrys and had been "previously made to sleep in dog kennels."

Officer Hill next spoke to V.P.'s 11–year–old sister, G.P., and noticed multiple injuries, which she photographed. Officer Hill noted that G.P. was unclean and, like V.P., was dressed differently from the rest of the Defendant's children. Officer Hill went to Gateway Medical Center ("Gateway Medical") with V.P. and G.P. At the hospital, both girls ate a lot of food, including several sandwiches, bags of chips, milk, and cookies. Officer Hill testified that she was in the emergency room with G.P. when G.P. told doctors that the marks on her body were from V.P. G.P. claimed that V.P. was "mentally retarded" and beat her up all of the time. When doctors asked G.P. how she got the ligature marks on her wrists and ankles, she claimed that she "tied herself up with a rope." G.P. also stated that V.P. ran away because V.P. wanted to be reunited with their older, biological sister who was not adopted by the Defendant.

Sergeant Donnie Robbins of the Clarksville Police Department testified that he also responded to the scene at Mrs. Taylor's residence on March 18, 2008. When he arrived, he saw the Defendant, Mr. Perry, and some children sitting inside a truck in front of Mrs. Taylor's home. Sergeant Robbins spoke with the Defendant and Mr. Perry briefly and then went inside Mrs. Taylor's residence. Sergeant Robbins saw V.P. sitting at a table. She was bleeding from the lip and had blood coming from the back of her head. Sergeant Robbins also noticed that V.P.'s left hand was severely deformed and she had ligature marks around her wrists and ankles. After speaking with V.P., Sergeant Robbins contacted a detective.

The Defendant and Mr. Perry gave Sergeant Robbins consent to search their home. Inside, the residence was in "total disarray, filthy, [and] smelled of urine and feces." Sergeant Robbins noticed a spatula, rolling pin, and white rope inside the residence, but another officer collected those items.

Susan Coghill, a paramedic with the Montgomery County Emergency Medical Services, testified that she treated V.P. after responding to Mrs. Taylor's residence. Ms. Coghill recalled that V.P. was very thin, wore dirty clothes, and had poor hygiene. V.P. complained of abdominal pain and head pain, and she said that her left hand was hurting. Ms. Coghill saw two burns on the back of V.P.'s head—one with the hair "sort of matted over it" and another with "white flesh showing and the hair missing." V.P. told Ms. Coghill that the Defendant had burned her head while fixing her hair. V.P. explained that she had been hit in the head on the same place as the burn earlier that day.

V.P. had a lot of bruising to the face, neck, knees and around both ankles and swelling to the tops of her feet. Ms. Coghill noted that the bruises appeared to be in various stages of healing. V.P. also had puncture marks between the webbing of her fingers on both hands. Additionally, V.P. had burns around her wrists, a burn to her left arm and left ear, and a swollen left hand. Regarding her hand, V.P. could only move two fingers and complained about "how bad it hurt."

Dr. Robert Paasche, an emergency room physician at Gateway Medical, testified that he treated V.P. and G.P. on March 18, 2008. After obtaining a medical history from both girls, Dr. Paasche examined them. Dr. Paasche observed multiple injuries to V.P. She had a linear burn through her hair on her scalp, which she stated was caused by a curling iron. V.P. had multiple contusions and abrasions on her face, some of which appeared to be several days old. Dr. Paasche noticed linear bruising up and down her neck and multiple bruises to her lower abdominal wall in various stages of healing.

V.P. told Dr. Paasche that she had been hit in the head and on her hand with a rolling pin, and she complained about having a lot of pain in her left thumb. Dr. Paasche noted that V.P.'s left hand had "quite a bit of deformity and swelling around the left thumb[.]" After x-rays were taken, Dr. Paasche discovered that the injury was a "very significant fracture" and dislocation of the thumb. Dr. Paasche did not believe that such an injury could be self-inflicted. V.P. also said that she had jumper cables

applied to her hands, and Dr. Paasche saw injuries to her hands that were consistent with V.P.'s explanation. She also had bruising all across her knuckles that appeared to be "recurrent, repeated injury ... like somebody's been hitting her on the knuckles."

Dr. Paasche testified that V.P. had a large area of bruising on her knees and legs, which looked like she had been forced to kneel or thrown to her knees several times. V.P.'s bottom was "essentially ... one big bruise across her entire buttocks." Dr. Paasche stated that it looked like multiple, recurrent injuries, which had caused soft tissue damage. V.P. indicated that she had been whipped and beaten with different objects, and Dr. Paasche testified that the injuries to her bottom could have been caused by a hand, belt, or some other object. V.P. also had linear abrasions and contusions around her ankles. Her feet were swollen and painful, and it appeared that circulation had been cut off to her feet. Dr. Paasche testified that these injuries were consistent with V.P.'s account of having been repeatedly tied down by the arms and ankles.

Dr. Paasche recalled that V.P. was calm as she described the abuse she had suffered. Based upon her demeanor, Dr. Paasche believed that V.P. had been experiencing a severe amount of pain for a long time and that she had become emotionally detached such that she was able to calmly discuss what had happened to her.

Dr. Paasche also treated G.P. During his examination, Dr. Paasche noted that the girl was malnourished and small for her age. G.P.'s lips were swollen, and she had multiple contusions and abrasions about her head and face in various stages of healing. When asked about a bruise to her forehead that appeared new, G.P. said that she had fallen earlier that day. Dr. Paasche testified that the marks on G.P.'s lips were consistent with having had jumper cables clamped onto her mouth.

Dr. Paasche recalled that G.P. had many areas of healing lacerations, abrasions, and bruising on her arms. She also had linear bruises around her wrists and arms that were consistent with something being tied very tightly around them. Additionally, Dr. Paasche noticed bruises along G.P.'s abdomen in various stages of healing and that she had a "large continuous area of bruising across her entire butt, which appeared to be related to repeated, recurrent trauma." Like her sister, G.P. had deep bruises on her knees and linear bruises around her ankles that were consistent with ligature marks. Dr. Paasche described pinpoint wounds on G.P.'s thighs, which he stated were consistent with having been caused by a staple gun. G.P. also had damage to the inside of both cheeks. Dr. Paasche testified that these injuries were from something pushing the inside of her mouth against her teeth, such as being slapped in the face repeatedly. G.P. also had a completely severed frenulum under her tongue, which Dr. Paasche described as a "hallmark sign of abuse." The injury to G.P.'s frenulum was consistent with having pliers pull at or yank on the tissue. These findings made Dr. Paasche concerned that G.P. had been suffering from severe abuse. He stated, "These are not normal childhood bumps and falls." Moreover, the injuries did not appear to be self-inflicted.

Dr. Laurie Harris-Ford, a pediatrician working at Gateway Medical, was called to the emergency room to see V.P. Dr. Harris-Ford conducted a physical exam, took a medical history, and wrote orders to admit V.P. to the hospital so that she could be observed overnight. Dr. Harris-Ford learned that V.P., who was 13 years old, was placed in the Defendant's home at age nine and began being abused by the Defendant around age 11. V.P. said that, earlier that day, the Defendant hit her on the head and on the left hand with a rolling pin. Dr. Harris-Ford noted that V.P. had a fractured and dislocated thumb and a contusion to the back of her skull. The girl also had multiple marks, bruises, and scars all over her body, including ligature marks around both ankles and wrists.

Dr. Harris-Ford testified that the injury to V.P.'s left thumb was consistent with someone bending back her thumb. The contusion to V.P.'s head was consistent with someone hitting her in the head with a rolling pin. Dr. Harris-Ford testified that bruises on V.P.'s fingertips were consistent with having jumper cables placed on them. Dr. Harris-Ford diagnosed V.P. as suffering from "acute abuse," a contusion to the head, and a dislocated thumb. The doctor saw no signs that V.P. was mentally retarded.

Seventeen-year-old V.P. testified that, in March 2008, she lived with her adoptive parents—the Defendant and Mr. Perry—and her siblings. V.P. recalled that she went to public school before she was adopted by the Defendant. After her adoption, the Defendant home-schooled V.P. and her siblings. V.P. explained, however, that she and G.P. were often singled out and treated differently from the rest of the Defendant's children. Many times, the Defendant made V.P. and G.P. clean the house instead of teaching them, and on one occasion, V.P. told the Defendant that the only reason she adopted them was so that they could be her "Merry Maids."

According to V.P., the Defendant was the "boss" in their house, but both the Defendant and Elizabeth would punish V.P. and G.P. V.P. explained that she was usually punished for not cleaning fast enough and for wetting the bed. As punishment for these offenses, the Defendant and Elizabeth would beat her with various items, including a red rubber hose, a baseball bat, metal poles from a closet organizer, and spatulas. The Defendant and Elizabeth also hit V.P.'s fingers, toes, knees, and elbows with a hammer if she did not clean quickly enough. V.P. explained that she would get blood clots under her fingernails from being hit with the hammer. On other occasions, the Defendant and Elizabeth used jumper cables on V.P. as punishment. V.P. testified that they would put jumper cables on her fingers, toes, lips, and breasts. The jumper cables created blisters, and they hurt a lot. When V.P. would cry, the Defendant would put the jumper cables on her lips to stop her from crying.

V.P. recalled that, one day, when she was working in the yard, the Defendant accused her of trying to tear up the Defendant's plants. The Defendant told V.P. that, since V.P. did not want to work, she would put clothes pins on V.P. The Defendant then applied clothes pins to V.P.'s lips, eye lids, ears, fingers, toes, legs, breasts, and vagina. The Defendant made V.P. leave the clothes pins in place until the rest of the

family had finished the yard work. V.P. recalled that the clothes pins hurt and made bruises all over her body.

On another occasion, the Defendant and Elizabeth bent back V.P.'s fingers as punishment for not cleaning properly. When they pulled back on her thumb, her thumb broke. V.P. testified that it "hurt really, really bad" and she could not use her hand afterwards.

While living with the Defendant, V.P. and G.P. were locked in dog kennels by the Defendant and Elizabeth for long periods of time. V.P. explained that she would be "bunched up" in the kennel with her knees to her chest and she had to sleep inside the kennel in that position. Additionally, because there was a lock on the kennel and she could not get out, V.P. would often use the bathroom on herself. One time, in order to clean out the kennel, the Defendant put it into a bathtub full of hot water while V.P. was still inside the kennel. V.P. testified that she held onto the top of the metal cage, trying to lift herself out of the hot water. The Defendant then poured boiling water from a tea pot onto V.P.'s hands. This caused V.P. to let go of the kennel and fall into the scalding water. Afterwards, the Defendant and Elizabeth put Aloe Vera and Vaseline on her bottom. V.P. testified that her injuries "hurt really bad" for a period of time. The skin on her bottom was red and peeled off, leaving a scar.

The Defendant and Elizabeth also restrained V.P. and G.P. by tying them to cots for long periods of time. V.P. recalled that the first time she was tied to a cot occurred prior to her thirteenth birthday. V.P. explained that sometimes they were made to lay on their backs, and sometimes they were placed on their stomachs. The Defendant placed handcuffs or rope around her hands and feet and used ropes and chains around the rest of her body. The ropes left ligature marks around V.P.'s wrists and ankles. The Defendant bound V.P. and G.P. together, connecting their ankles with handcuffs. After the ropes and handcuffs were on, the Defendant and Elizabeth would wrap a chain around V.P. and G.P. and put a lock on it. V.P. testified that she did not want to be tied down to the cot and she only got onto the cot so that she would not get into trouble. When she was tied to the cot, V.P. could not get up or move.

V.P. testified that the Defendant often withheld food from her and G.P. She estimated that the longest she and G.P. went without food was "three to five days." During that time, the Defendant would give them "a big cup of water and a piece of bread or a big cup of water and a vitamin." After not eating, V.P. felt weak and "very hungry." She did not feel healthy, and the lack of food made it hard for her to clean.

V.P. explained that she witnessed many of G.P.'s punishments. She recalled that the Defendant and Elizabeth would tie up G.P. and beat her. During one beating, the Defendant duct taped G.P.'s feet together and her hands behind her back. She then put duct tape around G.P.'s face to stop her from screaming. As the Defendant and Elizabeth beat G.P. with a red rubber hose and a bat, G.P. stopped moving and

breathing. The Defendant cut off the duct tape with a pair of scissors and told V.P. and Elizabeth to throw cold water on G.P.'s face. When they did, G.P. woke up and began breathing. The Defendant then instructed V.P. and Elizabeth to take G.P. upstairs and put her into a cold bath. The Defendant poured cold water on G.P.'s face and asked her if she was okay.

V.P. described another punishment G.P. suffered after G.P. urinated on herself while tied to a cot. The Defendant made V.P. hold down G.P.'s arms and legs. The Defendant then stuck a broomstick into G.P.'s vagina.

V.P. recalled that the only time she left the Defendant's home was to go to church and to clean the yard. When she went to church, she would wear turtlenecks and long sleeves to cover up scars on her body. V.P. testified that she never told anyone at church about the abuse because "they were [the Defendant's] friends and I never think nobody [sic] would believe me." V.P. denied ever taking swimming lessons or going to the YMCA after her adoption. Between the time of her adoption and the day she ran away, V.P. was never taken to see a doctor for her injuries.

V.P. testified that she decided to run away on March 18, 2008, because she thought that she and G.P. were going to die. On that day, V.P. was helping the Defendant in the kitchen when the Defendant said that V.P. was not doing something properly. The Defendant then hit her in the mouth with a spatula and in the head with a rolling pin. The rolling pin opened up a sore on the top of V.P.'s head, which had been caused days before by the Defendant's applying a flat iron to V.P.'s scalp. When the Defendant put V.P. out on the porch, V.P. told G.P. that she was going to run away. V.P. ran to the end of the street, yelling for help, and Mrs. Taylor came out on her front porch. V.P. testified that she got behind Mrs. Taylor on the porch when the Defendant, Mr. Perry, and the other children pulled up in a truck. When the police arrived at Mrs. Taylor's, V.P. told them about the Defendant's abuse.

G.P., who was 15 years old at the time of trial, testified that she was adopted by the Defendant and Mr. Perry in July 2004 when she was nine years old. G.P. described the first few years with the Defendant as "good" and "normal." She went shopping, out to eat, and to church with the family.

In the two years leading up to March 18, 2008, however, things became "rough" for G.P. in the Defendant's home. G.P. explained that the Defendant and Elizabeth began hitting her with various implements. As punishment for not cleaning fast enough, the Defendant and Elizabeth would hit G.P. with belts, ropes, bats, hammers, a metal pole, chains, and a red rubber hose. Sometimes the beatings would leave marks.

G.P. recalled a specific time when the Defendant hit her with a bat. G.P. had been in the living room folding clothes when Elizabeth said that she was not folding a shirt correctly. The Defendant came into the room with a bat and hit G.P. in the head with it. Another time, the Defendant hit G.P. with an ax, causing her arm to bleed. The Defendant would also purposely burned G.P.'s scalp with a flat iron while

10

fixing her hair. G.P. explained that the Defendant would leave the flat iron on her head "until she felt like taking it off." On another occasion, the Defendant was angry that G.P. was crying too loudly. She took a pair of pliers and put them under G.P.'s tongue, cutting the piece of skin there.

When shown police photographs of her back and neck, G.P. identified injuries that resulted from being hit with the red hose and a belt. G.P. identified a photograph of her legs and ankles and explained that the marks on her legs were from belts, the red hose, and extension cords. The bruises on her knees were caused by the Defendant's hitting her knees with a hammer. G.P. also identified bruises on her legs that were caused by a staple gun. She explained that the Defendant would put staples into her legs and then force her to pull them back out.

G.P. explained that she was not given a lot to eat while living with the Defendant and that sometimes the rest of the family would eat while she was locked downstairs in a dog kennel. G.P. specifically recalled that, on Thanksgiving Day one year, she was tied to a cot along with V.P. and they did not get to eat with the rest of the family. G.P. stated that the longest she went without food was five days. When she would tell the Defendant that she was hungry, the Defendant would not give her anything to eat. She felt weak when the Defendant withheld food.

G.P. testified that many nights she was made to sleep in a black metal dog kennel or a blue plastic kennel with V.P. When the Defendant and Elizabeth would lock the girls into the kennels, sometimes G.P. had on clothes and sometimes she was naked. She had to sit with her knees against the metal and legs bent into her chest. G.P. explained that she and V.P. could not get out of the dog kennels and often had to use the bathroom on themselves. G.P. testified that she and V.P. never put each other in the kennels "for fun." Many times when the rest of the family went to church, they were locked in a kennel in the basement, and they were sometimes left in a kennel for days.

At other times, the Defendant and Elizabeth tied G.P. to a cot by placing metal handcuffs on her wrists and ankles and wrapping a chain around her body. G.P. testified that she would get onto the cot to be tied down because she was afraid of the Defendant and Elizabeth. On many of these occasions, G.P. urinated and defecated on herself because she could not get up to go to the bathroom. G.P. recalled a specific instance when the Defendant stated that she was "tired of [G.P.] peeing on [herself]." After this pronouncement, the Defendant took off all of G.P.'s clothing and instructed Elizabeth and V.P. to hold down G.P.'s arms and legs. The Defendant then stuck a metal broomstick inside G.P.'s vagina. G.P. testified that it felt "[h]orrible" and that she bled from her vagina afterwards. Because she was bleeding, the Defendant instructed her to sit on an orange mop bucket.

G.P. described a second incident in which the Defendant punished her for urinating on herself. G.P. explained that she was again held down by Elizabeth and V.P. and the Defendant put the broomstick in her vagina. She did not bleed after this second incident. G.P. testified that the third time the Defendant used the broomstick on her

occurred in the upstairs hallway. Elizabeth and V.P. held G.P. down, and the Defendant inserted the broomstick into her vagina. The Defendant instructed Elizabeth and V.P. to turn G.P. over onto her stomach, and the broomstick was inserted into G.P.'s bottom. G.P. testified that it felt "awful." She screamed and tried to get away during these events.

G.P. recalled the Defendant and Elizabeth also tied her and V.P. to chairs that were placed back to back. Because she was tied to the chair with ropes, chains, and handcuffs, G.P. was unable to get up to use the bathroom and had to use the bathroom on herself. G.P. identified a key found inside the Defendant's home as being a key to the handcuffs that had been used on her. The Defendant and Elizabeth also forced G.P. and V.P. into a hall closet one day. They stacked baskets of clothes in front of the closet door so that the girls could not get out.

The Defendant and Elizabeth also used duct tape to restrain G.P. G.P. recalled one time when the Defendant and Elizabeth placed duct tape on her face "all the way around [her] mouth and nose, [her] eyes, [her] ears." The Defendant then beat G.P. with a bat all over her body because G.P. had not been working fast enough. G.P. testified that the beating hurt and she passed out at one point. She woke up in the bathtub upstairs. Someone had removed the duct tape from her face, and the Defendant apologized and asked if she was okay.

On the day that V.P. ran away, the Defendant hit G.P. and V.P. with a bat. The Defendant also placed jumper cables on G.P.'s lips and feet because she was crying. G.P. identified photographs of herself taken that day and explained that her lips were swollen from the jumper cables. G.P. acknowledged that she first told police that V.P. was mentally retarded and that V.P. would beat her up. She also told Officer Hill that the ligature marks on her wrists and ankles were from tying herself up. G.P. explained that she did not ask for help that night because she was afraid that she would have to go back to the Defendant's house. G.P. agreed that some of the marks on her body occurred from playing outside, but she denied that V.P. ever hit her. G.P. also denied that she had ever accused anyone else of abusing her.

G.P. testified that the Defendant had allowed her to play outside when she was first adopted. In the last two years that she lived with the Defendant, however, G.P. had not been allowed to play outside. G.P. only went to church with the family two or three times a month. She explained that she never reported the Defendant's abuse because the Defendant was always around. G.P. recalled one day when V.P. told the Defendant that the only reason she adopted them was so that she could have "Merry Maids." The Defendant laughed and replied, "[N]o, y'all are worse than that, y'all are my slaves."

Seventeen-year-old T.P. testified that he was adopted by the Defendant and Mr. Perry when he was a baby. Prior to the events of March 18, 2008, T.P. lived in the Defendant's home with the Defendant, Mr. Perry, and his six siblings. T.P. testified that the Defendant was the "boss" in the house, and she decided if someone was to be punished. Mr. Perry was not at the residence most of the time

12

because the Defendant would kick him out. The Defendant had a "really close" relationship with Elizabeth.

T.P. testified that, the last two years V.P. and G.P. were in the Defendant's home, the home was not a loving environment. The Defendant and Elizabeth often punished V.P. and G.P. by spanking them with belts. The Defendant punished the girls out of anger, and most of the time, V.P. and G.P. had done nothing to deserve punishment. T.P. saw the Defendant and Elizabeth punish V.P. and G.P. by putting jumper cables on their fingers. Occasionally, V.P. and G.P. were made to sleep in dog kennels in the basement or on the basement floor without blankets. Several times, the Defendant told T.P. to do things to hurt V.P. and G.P. or to "hold them down." T.P. testified that V.P. and G.P. had bruises and injuries "[a]ll over," which they did not have when they came to live with the Defendant but he never saw V.P. and G.P. hurt one another. T.P. recalled that V.P. and G.P. did not always go to church with the rest of the family. To explain their absences, the Defendant would tell church members that V.P. and G.P. were in Chattanooga or out of town.

On the day that V.P. ran away, the Defendant sat inside a truck outside Mrs. Taylor's residence with T.P. and his siblings. The Defendant told the children to tell police "everything was okay." The Defendant told them that "whenever all this was over ... she would keep [G.P.] and that she didn't like [V.P.]...."

T.P. testified that he was interviewed by a detective on April 7, 2008. At that time, T.P. denied seeing any abuse occur to V.P. and G.P. and claimed that he had seen the girls hit each other. T.P. also told the detective that he saw V.P. trip and fall three or four times on the day she ran away. T.P. testified that he did not tell the truth about the things going on inside the Defendant's home because he was scared. Even after he was removed from the Defendant's home, T.P. continued to see the Defendant during supervised visitations. During her visits, the Defendant instructed T.P. to tell authorities that the house "was nice and everything." The Defendant also told T.P. to tell police that the girls hit each other. T.P. explained that it took him a year before he told the police the truth.

S.P., who was 17 years old at trial, testified that he was also adopted by the Defendant and Mr. Perry as a baby. In March 2008, he lived in the Defendant's home, along with V.P. and G.P. He recalled that V.P. and G.P. were treated "[v]ery badly" by the Defendant and Elizabeth. Unlike the rest of the Perry children, V.P. and G.P. did not go places outside the home. The girls did not go to church or Sunday school. Instead, V.P. and G.P. spent a lot of time in the basement duct taped to the bed. S.P. explained that the Defendant duct taped V.P.'s and G.P.'s arms and legs and placed tape over their eyes and mouths so that the girls could not move and the girls would be tied up or locked in a kennel when the rest of the family left the house. Additionally, when the family would sit down at the table to eat, V.P. and G.P. did not join them. They were usually locked up during meals.

S.P. recalled that the Defendant and Elizabeth would also hit V.P. and G.P., using belts, baseball bats, switches, and extension cords. He also witnessed the incident

in which the Defendant burned V.P. and G.P. with hot water in the bathtub. He explained that the Defendant took boiling water from the stove and poured it on G.P. while G.P. sat in the bathtub screaming. The Defendant burned V.P. in the same manner, and V.P. screamed and "hollered" when the Defendant burned her. S.P. remembered seeing marks on the girls' arms, legs, necks, and "basically almost everywhere on their bod[ies]," but he never saw V.P. and G.P. hit one another or hurt themselves. S.P. testified that he was at Mrs. Taylor's house after V.P. ran away and the Defendant told him and the other children "not to tell anybody anything of what happened" in their house.

Ten-year-old M.P. testified that, prior to March 18, 2008, she lived in the Defendant's home with her adoptive sisters, V.P. and G.P. M.P. explained that the Defendant put V.P. and G.P. in dog kennels located inside the basement of the house. Many times, the girls did not have clothes on while in the kennels. M.P. also saw the Defendant tie V.P. and G.P. to chairs, using handcuffs and rope. The Defendant would hit V.P. and G.P. on their bottoms with a red "rubber thing." One time, M.P. saw the Defendant hit V.P.'s thumb with a hammer.

Jaha Martin testified that, in April 2008, she worked as a social worker at Our Kids, a clinic for children who are alleged to have been sexually abused. At that time, Ms. Martin spoke to V.P. and G.P. in order to gather information for the clinic's nurse practitioner. During their conversation, V.P. told Ms. Martin that she often had headaches, bad dreams, and difficulty sleeping. V.P. disclosed that she had been locked in a dog kennel and in a closet while in the Defendant's house. She also described being tied to a cot at times. She disclosed further physical abuse that included being hit with baseball bats and poles. V.P. described other occasions when she had hot water from the stove thrown on her, jumper cables placed on her lips and thumbs, and was beaten with a rubber hose. V.P. said that the Defendant and Elizabeth were her primary abusers.

Ms. Martin also obtained a medical history from G.P. G.P. related to Ms. Martin that she had been restrained multiple times by being tied to a cot and locked in a dog kennel. She recalled that, one time, duct tape had been applied to her mouth and she had difficulty breathing. G.P. disclosed that she had been struck with a bat, cut on the arm with an ax, and had jumper cables placed on her lips. G.P. also told Ms. Martin that a broomstick had been put in her vagina and her anus. She said that it hurt and she bled the entire day. G.P. indicated that the Defendant and Elizabeth had committed the abuse against her.

Beverly Cotton, a pediatric nurse practitioner, testified that she worked as a sexual assault nurse examiner with Our Kids in April 2008. Ms. Cotton conducted both a physical and genital exam of V.P. and G.P. During G.P.'s genital examination, Ms. Cotton noticed that G.P. had a complete absence of hymen tissue at about the four o'clock position, which was consistent with G.P.'s history of an object being inserted into her vagina. G.P.'s anal exam was normal.

Detective Larry Boren of the Clarksville Police Department testified that, on the night of March 18, 2008, he requested the police department's crime scene unit to respond to the Defendant's residence after Mr. Perry consented to a search of the home. Detective Boren explained that the Defendant's residence was filthy inside and had a strong odor. The search took hours because the home was in such disarray.

Several weeks later, Detective Boren interviewed the Defendant, Mr. Perry, and Elizabeth. Mr. Perry told the detective that he never saw the girls' injuries and he had no explanation for them. Elizabeth also claimed to have never seen the injuries to V.P. and G.P. During his interview with the Defendant, Detective Boren showed the Defendant photographs of the girls' injuries. The Defendant told Detective Boren that one of the girls put rubber bands around her wrists. The Defendant also said that V.P. had burned herself with a curling iron. She did not know how V.P. broke her thumb and claimed that V.P. had had no problems using her hand. The Defendant denied putting the V.P. and G.P. in dog kennels and sexually assaulting them.

Detective Boren also spoke to S.P. and T.P. They claimed that V.P. and G.P. were "emo" and that they hurt themselves. S.P. and T.P. denied that the Defendant had abused any of the children. S.P. related to the detective that V.P. and G.P. often fell out of trees and that was how they received some of their injuries.

Officer Brad Crowe of the Clarksville Police Department testified that, as part of the investigation into the abuse against V.P. and G.P., he searched the Defendant's home, which was a one story house with a basement. Inside the home, Officer Crowe located a set of jumper cables on top of the washer and dryer. He also found a rolling pin and two spatulas in the kitchen. In the basement bedroom, Officer Crowe located white nylon rope or twine near a cot, as well as a link chain that was attached to a floor joist. There was also an extendable shower curtain rod and a piece of aluminum pipe in the basement bedroom. Officer Crowe recalled that there were two dog kennels in the home–a plastic one and a larger, wire kennel. Investigators did not find any handcuffs in the residence.

Special Agent Charles Hardy with the Tennessee Bureau of Investigation (TBI) testified that he worked in the Serology and DNA Unit of the TBI crime lab. Agent Hardy tested several items of evidence in connection with the Defendant's case for the presence of blood and DNA. Agent Hardy testified that his examination of some white nylon rope yielded no blood and, while there was DNA present, it was too degraded to be conclusively tested. Agent Hardy also tested a set of jumper cables, and he explained that, while the testing of the jumper cables failed to indicate the presence of blood, he found a mixture of DNA belonging to V.P. and G.P. Agent Hardy testified that when he examined the rolling pin from the Defendant's residence, he found DNA that matched V.P.'s profile but he found no blood staining on the item. Finally, Agent Hardy tested two spatulas from the Defendant's home, but the DNA found on the items was insufficient or too degraded to be matched to any known profile.

15

Dr. Jeffry Watson, an orthopedic surgeon at Vanderbilt University, testified that in March 2008, he treated V.P. for an injury to her left thumb. V.P. reported that her left thumb hurt and did not move well. Dr. Watson found that V.P. had limited motion in the thumb and that the thumb was ineffective for grasping and holding objects. Upon further examination, Dr. Watson noted that V.P.'s thumb had been fractured and the fracture was not healing normally. He estimated that the fracture had occurred more than a month prior to V.P.'s visit and had yet not healed, which indicated to Dr. Watson that the thumb had been subject to a lot of motion. According to Dr. Watson, the fracture was consistent with V.P.'s thumb being pulled backwards by a significant amount of force. It was also consistent with being hit with a hammer. Dr. Watson performed two surgeries on V.P. in order to promote proper healing and to release some of the tightness in the muscle, skin, and ligament around the area. Dr. Watson testified that, despite two surgeries, V.P. still does not have normal use of her thumb.

Dr. Wesley Thayler, a plastic surgeon with Vanderbilt University, testified that he treated V.P. and G.P. for scarring. He reviewed the girls' medical history and learned that they had disclosed repeated trauma to and binding of their arms and legs. Upon his examination, Dr. Thayler found that V.P. and G.P. had multiple, significant scars on their arms and legs, which caused the girls "significant emotional distress." Dr. Thayler operated on V.P.'s right arm and right leg to make her scars less noticeable. He was not able to operate on all of V.P.'s scars because some were located too close to bones or joints. Dr. Thayler also operated on G.P.'s arms. While he was able to make the scars less noticeable on both girls, Dr. Thayler opined that the scars would last forever.

***Defendant's Proof***

Neda Johnson, a case manager with the Department of Children Services (DCS), testified that, in November 2002, she was the case manager for V.P., G.P., and their two biological sisters. Ms. Johnson recalled that V.P. and G.P. were originally placed in a foster home in Chattanooga but were removed after the foster parent notified DCS that she was not going to adopt the girls. Ms. Johnson reviewed a presentation summary from DCS dated December 3, 2003, which indicated that V.P. had been diagnosed with major depression disorder, recurrence, severe with psychotic features, anxiety disorder, impulse control disorder, and possibly post-traumatic stress disorder. She explained that V.P. and G.P. went to live with the Defendant in December 2003.

Gina Jirkovsky testified that, on December 26, 2003, the Defendant brought V.P. to see a doctor at Centennial Pediatrics, with the complaint that V.P. had sores around the genital area. Ms. Jirkovsky, who was a medical assistant, assessed V.P.'s medical history and checked her vital signs. At that time, V.P. did not have marks, bruises, and scars all over her body.

Kevin Finch testified that he had lived next door to the Defendant for the two years leading up to March 18, 2008. During that time, Mr. Finch sometimes saw V.P. and

G.P. outside in the yard. Occasionally, they were playing or riding bikes, but most of the time, Mr. Finch saw them doing yard work. Mr. Finch testified that the Defendant and her family went to church often and he saw V.P. and G.P. go to church with the rest of the family. Mr. Finch had been inside the Defendant's kitchen one time for a party, and he did not see anything that made him think that V.P. and G.P. were being abused.

Fred Tedescucci testified that he was a foster parent for all of the minor Perry children in March 2008, after the children were removed from the Defendant's home. Mr. Tedescucci described the children as "very well-behaved," with the exception of V.P. and G.P. While in his home, V.P. and G.P. were rowdy, argumentative, and always fighting with each other. During one argument, G.P. grabbed V.P.'s shirt and ripped it off of V.P. Mr. Tedescucci testified that he also caught V.P. and G.P. lying several times.

Christina Hite testified that she had also been a foster parent for V.P. and G.P. after they were removed from the Defendant's home. Initially, Ms. Hite took the girls into her home with the intention of adopting them, and she believed the girls' claims of abuse. Ms. Hite stated, however, that she eventually came to believe that V.P. and G.P. were not telling the truth about the abuse. She recalled that, in July 2009, while trying to punish G.P. by sending G.P. to her room, G.P. stated, "I am tired of you abusing me[.]" This statement concerned Ms. Hite, and she reported it to G.P.'s caseworker, Amanda McClain. On another occasion, G.P. told Ms. Hite that their biological sister, who had not been adopted by the Defendant, used to cut G.P. and V.P. with a knife. When G.P. made this comment, V.P. said, "Shhh." Ms. Hite recalled that V.P. later told her that the Defendant came to V.P. in a dream and said, "[T]ell the truth, just tell the truth."

In the year that V.P. and G.P. were in her home, Ms. Hite had to call the police two times. The first time, V.P. had been expelled from school for bullying another child. When Ms. Hite confronted V.P. about her behavior, V.P. started screaming at Ms. Hite and went outside. Ms. Hite called the police a second time after V.P. tore up a room and left the house. Ms. Hite explained that V.P. would get angry and say things like, "I'm going to cut your head off or I am going to cut your arms off and stick it in a blender...."

Ms. Hite also recalled that G.P. would kiss V.P. all over her body with an open mouth. One day, Ms. Hite saw G.P. in bed with V.P., and G.P.'s pants were off. V.P. angrily demanded that Ms. Hite get out of her room.

On cross-examination, Ms. Hite acknowledged that V.P. told her she ran away from the Defendant's house because the Defendant hit her with a spatula. Moreover, V.P. and G.P. expressed fear of the Defendant and Elizabeth. Both girls had recurring nightmares about the things that happened in the Defendant's home, and Ms. Hite agreed that the girls seemed visibly shaken after the nightmares. They also continued to wet their beds in Ms. Hite's home.

Amanda McClain testified that she worked for Omni Vision, an agency that provides therapeutic foster care for children with behavioral issues, educational and medical needs, and alcohol or drug dependence. Ms. McClain recalled that she received a phone call from Ms. Hite on May 19, 2009, over an incident with V.P. Ms. McClain went to Ms. Hite's residence and found V.P. outside, refusing to come back inside the home. V.P. was verbally aggressive and hostile. She did not want to obey Ms. Hite's rules and said that she "would rather go to jail than to stay [with Ms. Hite]."

Ms. McClain testified that she had documented a later conversation with Ms. Hite, in which Ms. Hite said that she believed both V.P. and G.P. were lying about the abuse they had suffered. Ms. Hite reported that the girls "tormented each other" and that she believed the Defendant was innocent. Ms. McClain recalled that Ms. Hite had wanted to adopt G.P. and she was upset after G.P. was removed from her home.

Ms. McClain testified that, in her time with the girls, she had seen V.P. get angry and hit or pinch G.P. However, Ms. McClain believed that V.P.'s and G.P.'s behavioral issues were similar to other abused and neglected children. Ms. McClain stated that she had seen a lot of children in foster care but she had never seen children with injuries like V.P. and G.P.

Erin Fowler, a clinical psychologist, testified that she saw V.P. and G.P. in April 2008. At that time, V.P. told Ms. Fowler that the Defendant's abuse began when she was six or seven years old and that she was hit with a hammer, bats, and chairs. Ms. Fowler acknowledged that a child's ability to conceptualize time was different from that of an adult and that if a child lacks environmental cues for dates and times, they can lose track of time.

Angela Groppel, the Defendant's long-time friend, testified that she attended church with the Defendant at First Assembly of God. On Sunday nights, Ms. Groppel ran a Junior Bible Quiz program at the church. She recalled that, in the 2006–2007 school year, V.P. and G.P. were registered to participate in the program. G.P. went to two Junior Bible Quiz competitions in November 2006, but after the first two classes, V.P. stopped attending the program. The Defendant told Ms. Groppel that V.P. had no desire to participate. Ms. Groppel testified that she still saw V.P. at church on Sunday mornings. She recalled that V.P. and G.P. were always nicely dressed at church. Ms. Groppel also saw V.P. and G.P. at home school co-op classes on Friday mornings in the 2007–2008 school year. Ms. Groppel stated that the Defendant appeared to be a loving mother and to take care of her children. Ms. Groppel saw no indications that V.P. and G.P. were being abused.

Keith Cherry testified that he had known the Defendant for about 16 years. He met the Defendant and Mr. Perry through the foster care program. Mr. Cherry and his family often spent holidays and birthdays with the Defendant's family. He testified that he had been to the Defendant's home many times and had never seen it in disarray. Mr. Cherry recalled that, in the months leading up to March 18, 2008, he had seen V.P. and G.P. while out to eat or out shopping. He also saw the girls on

18

Thanksgiving and Christmas in 2007. Mr. Cherry did not believe the girls were being abused.

Mr. Cherry's wife, Ramona, testified that she had known the Defendant for about 15 years. She met the Defendant through DCS foster care program meetings. Mrs. Cherry recalled that, before the Defendant finalized the adoption of V.P. and G.P., she brought them to Mrs. Cherry's home. Mrs. Cherry's first impression of the girls was that they were "not happy children." The Defendant tried to make them a part of the family, but it seemed that, the more the Defendant tried, the more V.P. and G.P. refused to be part of the family. Mrs. Cherry recalled that she was at the Defendant's home on Thanksgiving Day in 2007 and saw V.P. and G.P. in the kitchen eating that day.

Mrs. Cherry testified that, on one occasion, she noticed markings on the girls' arms and legs. They had rubber bands around their arms and legs, and Mrs. Cherry told the Defendant that the rubber bands could cut off their circulation. According to Mrs. Cherry, when she told V.P. and G.P. that they should take off the rubber bands, they said "that's in or something like that."

Mildred Ramsey testified that she met the Defendant through church in 1984. Ms. Ramsey stated that she would trust the Defendant with her grandchildren and great grandchildren. She did not believe the allegations against the Defendant. She testified that in the weeks prior to March 18, 2008, she had seen V.P. and G.P. at church and they were clean, well-dressed, and happy.

Michelle Fraley testified that, in 2002 or 2003, she met the Defendant and the Defendant's family through a home school co-op. Ms. Fraley recalled that, in the months leading up to March 18, 2008, she saw V.P. and G.P. at the co-op classes. The girls were dressed normally and seemed eager to meet their parents between classes. Ms. Fraley saw no indication that V.P. and G.P. were being abused.

Pearl Lucas testified that she attended church with the Perry family and had known the Defendant for about 15 years. Mrs. Lucas stated that the Defendant's family was a happy, loving family. She recalled that, in the months leading up to March 18, 2008, all of the children attended church regularly. Mrs. Lucas' husband, Leo, also testified that, in the period of time leading up to March 18, 2008, he saw the Perry family every Sunday and Wednesday at church.

Margarita Jacobs testified that she had attended church with the Defendant for eight years and, during that time, she worked with V.P. and G.P. in the children's choir. Ms. Jacobs testified that she was shocked by the allegations of abuse, as the girls had appeared normal.

Nece Rye testified that she knew the Perry family from church and that V.P. and G.P. had attended the Wednesday night girls' ministry there. Mrs. Rye recalled that, in the weeks and months prior to the charges, the Defendant's family seemed to be

happy and the whole family attended church together. Mrs. Rye saw no indications that V.P. and G.P. were being abused.

Larry Rye, the youth pastor at the Defendant's church, testified that he had seen the Defendant and her family in church in the months prior to V.P. making the allegations of [abuse] against the Defendant. However, he never saw anything to lead him to believe that V.P. and G.P. were being abused.

***State's Rebuttal Proof***

Dr. Janie Berryman, a licensed clinical psychologist, testified that a child's ability to conceptualize time is the last thing to develop cognitively. Dr. Berryman added that, when a child experiences trauma, this can add to the confusion surrounding the timing of events, especially if there are prolonged or multiple episodes of trauma. According to Dr. Berryman, children of abuse often have trust issues and difficulty managing their anger. She explained that children often do not tell about abuse because they fear that nobody will believe them.

Dr. Berryman treated V.P. and G.P. and recalled that both girls had trouble trusting others. V.P. had particular trouble adjusting and was sometimes aggressive. Dr. Berryman opined that V.P.'s aggressive behavior was typical under the circumstances.

(Doc. No. 14-15 at 3−23) (footnotes omitted).

### B. Post-Conviction Evidence

The Tennessee Court of Criminal Appeals summarized the evidence introduced during

post-conviction proceedings as follows:

Trial counsel testified that he had practiced criminal defense for twenty-two years. He said that before opening statements at the Petitioner's trial, the trial court provided the jury with a document that "reflected the language of the indictment." Counsel said that the language from each indictment count was "copied and pasted" into the document. Counsel said that he had never seen a court provide a jury with a similar document. He agreed the indictment contained factual allegations. After reviewing the trial transcript, counsel agreed the trial judge acknowledged that providing the jurors with the document was not its customary practice.

Trial counsel testified that he had never tried a case involving forty-five counts and that it never occurred to him a basis existed to object to the document provided to the jurors. He said that the prosecutor read the indictment to the jury before the proof and that counsel feared the jury would "blanketly convict" the Petitioner on all counts if the jury did not have "some kind of method of discerning between all of the proof in the two-week plus trial." Counsel said that, in his opinion, the

document did not prejudice the defense and that as a result, he did not object to the court's document.

Trial counsel testified after reviewing the trial transcript that a bench conference was held during V.P.'s testimony. Counsel agreed that the prosecutors requested the trial court's permission to treat V.P. as a hostile witness because the prosecutors believed V.P. lied during direct examination. Counsel stated that he did not object, that the defense had presented evidence of the victims' inconsistent statements during the trial, and that the prosecutors became frustrated with the victims, which led to the prosecutors requesting the trial court's permission to ask the victims leading questions. Counsel said that "trial strategy-wise," the trial was going well and that he did not object to the prosecutor's request. Counsel believed it was obvious to the jury that the State was "having problems" with the victims.

Trial counsel testified that he and counsel for the codefendants objected frequently to the prosecutor's leading questions. Counsel recalled that initially the trial court overruled the objections but that, as the testimony progressed, the court "continually" sustained the objections. Counsel recalled that he objected to leading questions about whether V.P. had clothespins placed on her body between her neck and waist and that the court sustained the objection. Counsel likewise recalled that the court sustained an objection related to whether dog chains were used to restrain the victims to beds.

On cross-examination, trial counsel testified that he presented multiple character witnesses in defense of the Petitioner. Counsel recalled that the Petitioner "would not testify." Counsel agreed that the trial court granted his motion for a judgment of acquittal for seven counts and that the jury acquitted the Petitioner of nineteen counts. Counsel believed the defense was successful based upon the facts of the case. Counsel said that the defense had an "uphill battle" based upon the recording of the 9-1-1 call and the medical evidence of the victims' injuries. Counsel said that the 9-1-1 recording reflected the Petitioner's confrontation with the neighbor who placed the call and a highly emotional situation between the women before the police arrived. Counsel said that he looked at the jurors as they listened to the recording.

Trial counsel testified that his case file contained a copy of the document provided to the jurors before the trial began. A copy of the document was received as an exhibit and reflects verbatim language of the forty-five indictment counts. The defendants' names were in bold font, and each count identified the specific victim. Counsel agreed that generally, trial judges advised potential jurors of the nature of a case and the individual charges.

Trial counsel testified that Tennessee Rule of Evidence 607 permitted the prosecutor's asking the victims leading questions and that the jurors knew the victims were being "somewhat impeached" by the prosecutor. Counsel recalled that the "children" who testified presented well to the jury and that the children became emotional. Counsel recalled that V.P. became too emotional to testify and that the

court excused the jury to allow her time to regain her composure. Counsel said that he did not want to offend the jurors during the testimony of the children.

On redirect examination, trial counsel testified that he would be surprised if the transcript did not reflect the reading of the indictment, although he did not have any specific recollection of it. He said that although he had never heard a trial court tell a jury the details of the factual allegations contained in the indictment, the indictment is "laid before the jury" every time before a trial begins. Counsel said the jury always knew the allegations before the presentation of the evidence.

(Doc. No. 16-17 at 3−5).

## III.    Governing Standards

A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA creates both procedural and substantive limits on the court's authority to grant habeas corpus relief for a petitioner in custody pursuant to a state court judgment. The court sets forth the standards applicable to this Petition below.

### A.  Procedural Default

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court . . ., thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted). In Tennessee, a petitioner is "'deemed to have exhausted all available state remedies for [a] claim'" when the claim is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 401 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). If a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a

22

claim, the claim is "technically exhausted" but procedurally defaulted. *Woodford v. Ngo*, 548 U. S. 81, 126 (2006).

A petitioner may obtain merits review of a procedurally defaulted claim by demonstrating "cause and prejudice" for the default. *Sutton v. Carpenter*, 745 F.3d 787, 791 (6th Cir. 2014). To establish cause, the petitioner must show that "some objective factor external to his defense impeded his ability to comply with the state's procedural rule." *Bies v. Sheldon*, 775 F.3d 386, 396 (6th Cir. 2014).

### B. Merits Review

Under the AEDPA, a federal court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court only if that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

If a claim was not adjudicated on the merits in state court, this Court applies the "pre-AEDPA standard of review: *de novo* for questions of law (including mixed questions of law and fact), and clear error for questions of fact." *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011); *see* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

23

### C. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees to a person accused of a crime the right to effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Bell v. Cone*, 535 U.S. 685, 694−95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 686−87 (1984). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## IV. Analysis

Respondent argues that Grounds 1 and 2 of the Petition are without merit, that Ground 3 is not cognizable on federal habeas review, and that Ground 4 is procedurally defaulted.

### Ground 1 – ineffective assistance of trial counsel for failing to object to the written guide

In Ground 1, Petitioner alleges that trial counsel was ineffective for failing to object when the trial court provided the jury with a written guide to the charges against Petitioner and her codefendants.[1] (Doc. No. 1 at 6). Petitioner raised this claim in state court on post-conviction appeal.

---

[1] Petitioner also asserts in Ground 1, "Det. Larry Borens, Investigative report with Tyler, Spencer, Mary Perry, Tyler, Spencer, and Mary said that [they] saw [V.P.] and [G.P.] wearing rubber[ ]bands on their arms and legs and also saw them cut themselves." (Doc. No. 1 at 5−6). Petitioner does not allege that trial counsel was ineffective with regard to this investigative report. (*Id.*). Any such claim would be procedurally defaulted, as Petitioner did not raise it in the Tennessee Court of Criminal Appeals on post-conviction review. (*See generally* Doc. No. 16-9).

24

Notably, Petitioner does not argue—and did not argue in state court—that provision of the written guide itself violated the Constitution. (Doc. No. 1 at 6; Doc. No. 16-9 at 12−15). She argues instead that counsel should have objected under Rule 30(c) of the Tennessee Rules of Criminal Procedure. (Doc. No. 16-9 at 13−15). But the Tennessee Court of Criminal Appeals held that providing the written guide to the jury did not violate Rule 30(c). And this court must accept the Tennessee court's application of Tennessee law. *Thomas v. Stephenson*, 898 F.3d 693, 701 (6th Cir. 2018) ("[I]t is 'not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" (quoting *Estelle v. McGuire*, 502 U.S. 62, 67−68 (1991)). Given this holding, the Tennessee Court of Criminal Appeals reasonably found that trial counsel was not ineffective for failing to object to provision of the written guide. *Tackett v. Trierweiler*, 956 F.3d 358, 375 (6th Cir. 2020) ("The failure to raise a meritless claim does not constitute ineffective assistance of counsel."). Habeas relief is not available on Ground 1.

### Ground 2 – ineffective assistance of trial counsel for failing to object to State's treatment of victims as hostile witnesses

In Ground 2, Petitioner alleges that trial counsel was ineffective for failing to object when the State requested permission to treat V.P. and G.P. as hostile witnesses. The Tennessee Court of Criminal Appeals considered and rejected this claim on post-conviction appeal:

> At a bench conference during V.P.'s testimony, the prosecutors expressed concern with V.P.'s testimony that the Petitioner had penetrated V.P.'s vagina digitally, rather than with an object. The indictment did not allege digital penetration, and the State had alleged the Petitioner had penetrated V.P.'s vagina with a mop or broom. The trial court told the prosecutor that she could impeach any witness if she had a good-faith basis and asked if she had a good faith-basis. *See* Tenn. R. Evid. 607 ("The credibility of a witness may be attacked by any party, including the party calling the witness."); Tenn. R. Evid. 611(c)(2) (mode and order of interrogation in connection with hostile witnesses). The prosecutor stated she had a good-faith basis based upon the forensic interview. The court stated that if the prosecutor could not impeach V.P. successfully, the court would stop the questioning.

> Trial counsel did not object. However, the record reflects that counsel and codefendant Elizabeth Perry's trial counsel objected to multiple leading questions.

25

Although the Petitioner alleges that the State requested permission and was permitted to ask G.P. leading questions in an effort to impeach G.P., the record reflects that during direct examination, the trial court requested a bench conference, at which time the court instructed the prosecutor to stop asking G.P. leading questions. The prosecutor responded that she was attempting to prevent G.P. from rambling and that she would ask more open-ended questions. Trial counsel stated that he was "very concerned," although he had objected throughout G.P.'s testimony. As a result, the record does not reflect that the State sought to impeach G.P. by asking leading questions. We note that the Petitioner only cites to the trial transcript in connection with V.P.'s testimony and does not cite to the transcript in connection with G.P. *See* T.R.A.P. 27(a)(7)(A) (requiring that an appellant's argument contain "citations to the authorities and appropriate references to the record . . . relied on"); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived[.]"). We decline to speculate as to the Petitioner's complaints relative to G.P.

Trial counsel's credited testimony reflects that he did not object to the leading questions because the defense theory was that the victims had provided multiple inconsistent statements before the trial and that the continued inconsistent statements during the trial benefited the defense. Counsel stated that the prosecutors became frustrated with the victims during the trial and that it would have been obvious to the jury that the State was impeaching the victims. Counsel objected multiple times during V.P.'s direct examination, and the trial court sustained some of those objections. Furthermore, counsel said that the children who testified presented well to the jury and that the children became emotional at times, which is supported by the trial court record. The trial transcript reflects that V.P. became emotional during her trial testimony. The trial court interjected during direct examination because the court could not understand V.P. The court told V.P. to compose herself, and direct examination continued. V.P. became emotional again, and the trial recessed for fifteen minutes. After the jury was out of the courtroom, the court told V.P. that she was going to have to regain her composure because the questioning would be lengthy. Counsel did not want to offend the jury during the testimony of the victims and made a strategic decision not to object to the leading questions. The record supports the post-conviction court's determinations that trial counsel did not provide deficient performance in this regard and that the Petitioner failed to establish prejudice. The Petitioner is not entitled to relief on this basis.

(Doc. No. 16-17 at 9−10).

The court need not assess whether trial counsel was deficient, because Petitioner has not

demonstrated that the Tennessee Court of Criminal Appeals relied on an unreasonable

determination of law or fact in making its prejudice determination. *Jones v. Bagley*, 696 F.3d 475

(6th Cir. 2012) ("Because a petitioner must show both *Strickland* prongs in order to gain relief, if

the prejudice prong demonstrates that the petitioner is not entitled to relief we need not analyze the competence prong."). Petitioner does not identify any question that the prosecutor asked of V.P. or G.P. that would have resulted in a sustained objection—let alone any resulting testimony by V.P. or G.P. that would have created a reasonable probability of a different outcome had the testimony been excluded. (Doc. No. 1 at 7). Accordingly, Petitioner has failed to show that the Tennessee Court of Criminal Appeals made an unreasonable determination as to prejudice, and Petitioner is not entitled to habeas corpus relief on Ground 2. *See* 28 U.S.C. § 2254(d).

### Ground 3 – Ineffective assistance of post-conviction counsel

In Ground 3, Petitioner alleges that state post-conviction counsel was ineffective. (Doc. No. 1 at 8) (framing the claim as "[w]hether post-conviction counsel provided adequate representation"). This claim is barred by statute. 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). Petitioner is therefore not entitled to relief on Ground 3.

### Ground 4 – Due process based on unsequestered jury

In Ground 4, Petitioner alleges that "[t]he jury went home everyday and read the papers watched television news reports, and watched the internet." (Doc. No. 1 at 10).

Respondent asserts, and Petitioner does not rebut, that this claim is procedurally defaulted because Petitioner failed to present it in state court. (Doc. No. 17 at 34). Indeed, Petitioner did not present any claim based on jury sequestration or media publicity in the Tennessee Court of Criminal Appeals on direct appeal or post-conviction appeal. (*See generally* Doc. Nos. 14-3, 14-4, and 16-9). This claim is therefore procedurally defaulted. *Adams*, 330 F.3d at 401. Petitioner does

27

not acknowledge the default or offer any basis for excusing it. She is therefore not entitled to relief on Ground 4.

## V. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas corpus petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Here, jurists of reason would not disagree that Petitioner is not entitled to relief under 28 U.S.C. § 2254(d) as to Grounds 1 and 2, that Ground 3 is barred by 28 U.S.C. § 2254(i), or that Ground 4 is procedurally defaulted. The court will therefore not issue a certificate of appealability. Petitioner may nevertheless seek one in the Sixth Circuit.

## VI.  Conclusion

As discussed above, the court **DENIES** Petitioner's 28 U.S.C. § 2254 petition for writ of habeas corpus and **DISMISSES** this action with prejudice. A certificate of appealability is **DENIED**.

This is the final order in this case, and because it denies all relief, the Clerk **SHALL** enter judgment. *See* Fed R. Civ. P. 58(b)(1)(C).

IT IS SO ORDERED.

_____
Aleta A. Trauger
United States District Judge